## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

No. 18-MJ-03119-TORRES

UNITED STATES OF AMERICA

v.

FRANCISCO CONVIT GURUCEAGA, et al.,

Defendants.

_____/

## CRIMINAL COVER SHEET

1.  Did this matter originate from a matter pending in the Northern Region of the United States Attorney's Office prior to October 14, 2003? _____ Yes __X__ No

2.  Did this matter originate from a matter pending in the Central Region of the United States Attorney's Office prior to September 1, 2007? _____ Yes __X__ No

Respectfully submitted,

BENJAMIN G. GREENBERG
UNITED STATES ATTORNEY

BY: _____
FRANCISCO R. MADERAL
ASSISTANT UNITED STATES ATTORNEY
Fla. Bar. No. 41481
99 N. E. 4th Street
Miami, Florida 33132-2111
TEL (305) 961-9159
FAX (305) 530-7976
francisco.maderal@usdoj.gov

AO 91 (Rev. 08/09)   Criminal Complaint

# UNITED STATES DISTRICT COURT
### for the
Southern District of Florida

| | |
|---|---|
| United States of America<br>v.<br><br>FRANCISCO CONVIT GURUCEAGA, et al.,<br><br>_____<br>*Defendant(s)* | )<br>)<br>)<br>)<br>)<br>)<br>) | Case No.  18-MJ-03119-TORRES |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____ 12/2014-7/2018 _____ in the county of _____ Miami-Dade _____ in the

____ Southern ____ District of _____ Florida _____ , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| Title 18, United States Code,<br>Sections 1956(h) & 1956(a)(2) | Conspiracy to Committ Money Laundering |
| Title 18, United States Code,<br>Section 1952 | Interstate and Foreign Travel in Aid of Racketeering Enterprises |

This criminal complaint is based on these facts:

SEE ATTACHED AFFIDAVIT.

☑ Continued on the attached sheet.

_____
*Complainant's signature*

George F. Fernandez, S/A, HSI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: July 23, 2018

_____
*Judge's signature*

City and state: _____ Miami, Florida _____          Edwin G. Torres, U.S. Magistrate Judge
*Printed name and title*

## **AFFIDAVIT**

I, GEORGE F. FERNANDEZ, Special Agent with Homeland Security Investigations ("HSI"), having been first duly sworn, do hereby depose and state as follows:

### **INTRODUCTION**

1.     I am an investigative or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18 of the United States Code. That is, I am an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Title 18, United States Code, Section 2516(1).

2.     I have not necessarily included in the affidavit each and every fact known to me about the matters set forth herein, but only those facts and circumstances that I believe are sufficient to establish probable cause for the Court to sign a criminal complaint.

3.     The statements contained in this affidavit are based upon my investigation, information provided by other individuals, including sworn law enforcement officers and confidential sources, and upon my experience and training as a federal agent and the experience and training of other federal agents.

4.     All dates, times, and amounts stated herein are approximate. Quotations and summaries of recorded conversations are based on transcriptions with side-by-side Spanish-to-English translations or the actual Spanish-language recordings. In reviewing the transcripts, I relied on both the translations and my knowledge of Spanish, as well as that of others.

5.     This affidavit is made in support of a criminal complaint charging the following defendants, with conspiracy to commit money laundering, in violation of Title 18, United States Code, Section 1956(h), and violations of the Travel Act, in violation of Title 18, United States Code, Section 1952.

## Defendants & Others Involved

6.    **Francisco CONVIT Guruceaga** is a Venezuelan national. CONVIT, along with CONSPIRATOR 2, is often referred to as a "Bolichico" or member of the "boliburgués."

7.    **Jose Vincente AMPARAN Croquer, a.k.a., "Chente"** is a Venezuelan national and professional money launderer. AMPARAN is associated, along with CONSPIRATORS 5 and 6, with "European Company 1" in Spain, which is a money laundering front operating as a real estate investment firm. AMPARAN also maintains relationships with "European Financial Institution 1" in Malta, a private investment firm, which he uses to launder money.

8.    **Carmelo URDANETA Aqui** is a Venezuelan national and former Legal Counsel to the Venezuelan Ministry of Oil and Mining.

9.    **Abraham Edgardo ORTEGA** is a Venezuelan national and former Executive Director of Finance at Venezuelan state-owned oil company, Petróleos de Venezuela, S.A. (PDVSA).

10.    **GUSTAVO Adolfo Hernandez Frieri** is a Colombian national by birth and naturalized U.S. citizen (as of May 2013). GUSTAVO is a professional money launderer who uses his financial firms, Global Security Advisors (GSA) and Global Strategic Investments, in Miami, Florida, to launder money with false-mutual-fund investments.

11.    **Hugo Andre Ramalho GOIS** is a Portuguese national and professional money launderer associated with AMPARAN.

12.    **Matthias KRULL** is a German national and Panamanian resident. KRULL was a high-level banker at a large Swiss bank, specializing in Venezuelan clients. KRULL is the personal banker of CONSPIRATOR 7 and others. KRULL manages "banking" activities for numerous Venezuelan officials and kleptocrats.

13.     **Marcelo Federico GUTIERREZ Acosta y Lara** is a Uruguayan national. GUTIERREZ is part of an ownership group of at least one U.S. bank that facilitates money laundering and is associated with GUSTAVO.

14.     **CONSPIRATORS 1 – 9** are some of the additional uncharged members of the conspiracy along with others. CONSPIRATORS 1 – 9 include other former PDVSA officials, individuals associated with CONVIT, reported members of the "boliburgués," and professional third-party money launderers.

15.     **VENEZUELAN OFFICIALS 1 – 3** are foreign officials.

**PROBABLE CAUSE**

16.     In 2016, a Confidential Source (CS) approached the HSI Miami Office (HSI-Miami) regarding 78 million in Euros the CS received, which originated from a loan contract with PDVSA. The CS was involved in a money laundering conspiracy and wanted to surrender the money and cooperate. HSI-Miami thereafter began an undercover investigation: Organized Crime and Drug Enforcement Task Force (OCDETF) Operation Money Flight.

17.     The CS agreed to wear a recording device and Operation Money Flight proceeded proactively with an initial focus on the defendants' efforts to launder a portion of the 78 million in Euros (the "PDVSA funds") in and through South Florida.

18.     Two years and over one hundred recordings later, Operation Money Flight revealed an international conspiracy to launder the PDVSA funds through Miami and several large-scale, international third-party money-laundering organizations. More specifically, the investigation revealed the use of Miami real estate and sophisticated false-investment schemes to launder hundreds of millions of U.S. Dollars.

3

## Venezuelan Corruption & Miami Laundering

19.     Venezuela has a foreign-currency exchange system under which the government will exchange local currency (Bolivars) at a fixed rate for U.S. Dollars.  The fixed exchange rate has been well below the true economic rate by a substantial factor for several years. For example, in 2014, the Venezuelan government fixed exchange rate was approximately six Bolivars to one U.S. Dollar. By contrast, the true economic exchange rate was approximately sixty Bolivars to one U.S. Dollar.

20.     The difference between the fixed rate and the true economic rate creates opportunity for fraud and abuse.

21.     For example, in 2014, an individual could exchange 10 million U.S. Dollars for 600 million Bolivars at the true economic rate. Then, if that individual had access to the government fixed rate, he could convert that same 600 million Bolivars into 100 million U.S. Dollars. Essentially, in two transactions, that person could buy 100 million U.S. Dollars for 10 million U.S. Dollars.

22.     Massive fraud and corruption is rampant throughout Venezuela's government-run foreign-exchange system. Estimates of the fraud range as high as $20 billion a year, and reports indicate that corrupt government officials take kickbacks to authorize exchanges at the fixed rate.[1]

23.     Embezzlement of Venezuela's dwindling foreign currency reserves is the fuel for these corrupt exchange schemes. PDVSA is Venezuela's primary source of income and foreign currency (namely, U.S. Dollars and Euros), and serves as the source of foreign currency used to

---

[1] Reuters, *Venezuela Says 40 Percent of Dollar Buyers Are Shell Companies,* Dec. 12, 2013, available at http://www.reuters.com/article/us-venezuela-economy-idUSBRE9BBOT820131212

fund corrupt foreign exchange embezzlement schemes. As with Venezuela in general, fraud and corruption is reportedly common at PDVSA.

24.     Venezuela's state of social, political, and economic crisis in which multi-billion-Dollar corrupt and criminal ecosystems thrive drives rivers of criminal proceeds through South Florida, which has become an international money-laundering hub and a desirable destination for well-to-do foreign criminals and kleptocrats.

### False-Investment Money Laundering

25.     Most of the defendants are sophisticated operators with respect to the international banking system and are aware of banks' general due diligence and anti-money laundering practices, including know-your-customer (KYC) requirements.

26.     Importantly, for one party to wire funds to a third party, there must be some legitimate business justification provided to the bank; for instance, a payment for the purchase of real estate or equipment. Moreover, a bank will ask for documents supporting the justification, which—depending on the transaction—can be difficult to manufacture; for instance, a bank may be able to verify whether a supposed real estate transaction took place. This verification poses a problem for money laundering transactions in which large sums of criminal proceeds must be moved around the financial system from one person to another as bribes, kickbacks, transfers, or exorbitant expenditures, for instance.

27.     Accordingly, false investments in fake securities are convenient justifications in that they are more difficult for a bank to investigate and verify. By way of example, one party might wire 30 million U.S. Dollars to a third party with the justification that the amount is a loan to the third party, supported by a 30 million U.S. Dollar promissory note due at some point in the

future, which neither party actually intends to honor. For the bank, ascertaining the true intent of the parties and the fraudulent nature of the investment is difficult.

28.    Sophisticated false-investment money laundering schemes are used throughout this conspiracy, ranging from individual false securities (promissory notes and bonds) to entire false-investment funds, which can be subscribed to as needed to justify transactions.

29.    Surrounding and supporting these false-investment laundering schemes are complicit money managers, brokerage firms, banks, and real estate investment firms in the United States and elsewhere, operating as a network of professional money launderers.

### Money Laundering Conspiracy

30.    The conspiracy in this case began in December 2014 with a currency exchange scheme to embezzle approximately 600 million U.S. Dollars from PDVSA, obtained through bribery and fraud, and the defendants' efforts to use the CS to launder a portion of the proceeds of that scheme (the PDVSA funds).  By May of 2015, the conspiracy had doubled in amount to 1.2 billion U.S. Dollars embezzled from PDVSA.

31.    The facts of the conspiracy set forth below are evidenced by electronic communications and documents, government records, financial records, recordings of phone conversations and in-person meetings, and CS statements.

### CONVIT & URDANETA Approach the CS

32.    In 2014, URDANETA and CONVIT approached the CS with an offer to sell 100 million U.S. Dollars at a favorable Bolivar exchange rate and without the CS having to front the Bolivars.

33.     The CS agreed because the CS had clients in Venezuela to whom the CS could sell the U.S. Dollars. From previous business dealings, the CS knew CONVIT obtained U.S. Dollars from exchange contracts with PDVSA.

34.     The CS expected to receive a simple buyer-seller foreign exchange ("forex") contract to memorialize the agreement with CONVIT and URDANETA.

35.     Over the course of the next month, January 2015, CONVIT, URDANETA, and the CS continued to discuss and facilitate the supposed forex transaction, often via BlackBerry Messenger (BBM) chats and while CONVIT was present in the Southern District of Florida, according to U.S. travel and other records.[2]

36.     During this time, CONVIT delayed providing the forex contract to the CS, but this did not overly concern the CS because the funds were coming from a regulated asset management firm, "European Financial Institution 1," which the CS could explain to the receiving bank.

37.     The CS instructed CONVIT to wire the funds from European Financial Institution 1 to an account belonging to a trust, of which the CS was the ultimate beneficiary. CONVIT agreed and informed the CS that the funds would arrive in Euros and not U.S. Dollars.

38.     By February 12, 2015, the CS had received approximately 78.8 million Euros into the trust from European Financial Institution 1 in four separate wire transfers beginning on January 14, 2015.

39.     After receiving the initial 36 million Euros in mid-January, the CS asked CONVIT via BBM chat on January 13, 2015 if the CS could sell about 20 million Euros to a client, but CONVIT replied "no." CONVIT explained that he had already paid for the Bolivars on his end

---

[2] According to these records, CONVIT arrived in the Southern District of Florida on December 20, 2014 and departed on January 18, 2015.

(meaning he had no immediate need for Bolivars), and that the CS would have to wait about a month to sell the Euros further.

40.    On February 6, 2015, the CS informed CONVIT that the CS urgently needed the forex contract between the CS and European Financial Institution 1 for the CS's bank's compliance department. The CS asked CONVIT for a form draft so that the CS could prepare it.

41.    That same day, CONVIT finally sent the CS a (PDF) document to justify the transfer between European Financial Institution 1 and the CS's trust. What CONVIT sent, however, was a false joint venture contract between a Hong Kong shell company, Eaton Global Services Limited, and the CS's trust, with a forged signature on behalf of the CS's trustee. The CS had never seen this contract before.

42.    The fake joint venture contract, dated December 17, 2014, contemplated a fictitious 600 million U.S. Dollar joint venture between Eaton Global and the CS's trust; the supposed business of the joint venture was the making of loans to PDVSA.

43.    On February 9, 2015, the CS told CONVIT that the fake joint venture contract could not be used. CONVIT and URDANETA assured the CS that the fake contract had not been used or provided to any bank.

44.    The CS also requested the original underlying exchange contracts and CONVIT responded that URDANETA had physical copies and would deliver them. Days later in Venezuela, the CS received the documents in-person from URDANETA, who explained that he obtained the documents from "CONSPIRATOR 1," a former PDVSA official.

45.    These documents, which the CS provided to HSI-Miami, reveal the source of the PDVSA funds and the nature of the scheme.

**PDVSA Bribery & Embezzlement Scheme Revealed**

46.     The source of the PDVSA funds was a PDVSA foreign-currency exchange scheme benefitting Eaton Global. The exchange scheme was disguised as a "financing" arrangement using the following three documents (provided by URDANETA) in an artless attempt to hide what was ultimately revealed as an embezzlement:

       a.     First, a <u>loan contract</u>, dated December 17, 2014, between PDVSA and Rantor Capital C.A., a Venezuelan shell company, in which Rantor agreed to loan 7.2 billion Bolivars to PDVSA. The loan contract was executed by "VENEZUELAN OFFICIAL 1" as Vice President of PDVSA;

       b.     Second, an <u>assignment contract</u>, dated December 23, 2014, between Rantor and Eaton Global, in which Rantor assigns its rights as PDVSA's creditor under the loan contract to Eaton Global and in which it is contemplated that PDVSA is given the right to cancel the debt within 180 days by paying 600 million U.S. Dollars; and

       c.     Third, a <u>notice of assignment letter</u>, dated December 23, 2014, in which Eaton Global informs PDVSA (VENEZUELAN OFFICIAL 1) of the assignment and suggests that PDVSA repay the 7.2 billion Bolivar loan in the Euro equivalent of 600 million U.S. Dollars. The letter included instructions for PDVSA to wire the funds to European Financial Institution 1 accounts for the benefit of Eaton Global.

47.     In short, Eaton Global ended up with the right to pay PDVSA about 7.2 billion Bolivars (worth around 35 million Euros) and receive about 510 million Euros, of which about 78.8 million Euros was sent to the CS.

9

48.     While the CS continued to wait for a forex contract from CONVIT and URDANETA, the CS began to conduct third-party transactions on their and CONSPIRATOR 1's behalf. Ultimately, the CS learned that the CS was not involved in a forex transaction, but rather a money laundering operation in which the CS was expected to launder the proceeds of the embezzlement and make cash kickback payments to VENEZUELAN OFFICIAL 1.

49.     In April 2015, the CS began making cash payments in Venezuela at URDANETA and CONSPIRATOR 1's direction, including to URDANETA, CONSPIRATOR 1, and VENEZUELAN OFFICIAL 1, which would ultimately total over 1 million U.S. Dollars.

50.     In all, the CS conducted approximately 15 million Euros-worth of transactions through the summer of 2015, including several U.S.-Dollar wire transactions at the defendants' direction,[3] until the CS began to resist making further payments. Around that time, the CS used the liquidation of the CS's trustee as an excuse to halt payments; the CS claimed that the CS could not continue without the forex contract. CONVIT and URDANETA continued to pressure the CS. The ensuing impasse led to a meeting around November 2015 at CONVIT's office in Venezuela.

51.     Around November 2015, CONVIT summoned the CS to a meeting at CONVIT's office in Caracas, Venezuela. Prior to the meeting, CONVIT explained to the CS that the CS would meet AMPARAN, who was in charge of the financial documents.

52.     At the meeting, CONVIT, URDANETA, AMPARAN, and the CS sat around a table. CONVIT had a handgun on the table. Next to CONVIT was a German Shepard with a shock collar. CONVIT held the remote for the collar, and commented that he could not always control

---

[3] Based upon my training and experience, I know that international U.S.-Dollar wire transactions are routed and processed through banks located in the United States.

the dog. The meeting took place at CONVIT's office with numerous security guards; according to the CS, the mood was one of intimidation by CONVIT.

53.     AMPARAN told the CS that the fake joint venture contract had in fact been provided to European Financial Institution 1's banks in Canada and Malta. Accordingly, AMPARAN explained that it would be impossible to replace the contract with a simple forex contract and additional fake contracts were needed. The CS asked to return the PDVSA funds and reverse the transactions, but was told a reversal was impossible.

**The CS Records the Defendants**

54.     Beginning in February 2016, the CS recorded conversations with the defendants and other conspirators in which they explicitly acknowledged the money laundering conspiracy and underlying embezzlement. As evidence by the following recordings, during this time, the CS worked with URDANETA, ORTEGA, and CONSPIRATOR 1 to account for and distribute the PDVSA funds to themselves and others and to ensure that AMPARAN supplied the additional fake contracts necessary to do so.

55.     In a February 19, 2016 recorded meet with URDANETA, the CS complained that the CS needed additional documents from AMPARAN.  URDANETA agreed and said that he would write to AMPARAN, CONVIT and "CONSPIRATOR 2" to "bug them" about the contracts. URDANETA also stated that they (CONVIT, et al.) are being "hit right now" by people in the "assembly" and joked that it is not a "piñata," in an apparent reference to corrupt Venezuelan officials hitting the defendants up for bribes. URDANETA also stated that he would not go to the United States because the last time he was searched at the border and "they took away [his] phone. [And t]hank God [he] didn't have [his] phone, but a new phone."

56.   In a February 22, 2016 recorded meet with ORTEGA, ORTEGA and the CS discussed how to move ORTEGA's money from the CS to ORTEGA. The CS explained that it is not simple, and ORTEGA, regarding the source of his portion of the PDVSA funds, stated:

> So we can be frank and open with each other. Now. You know the origin of that. And that comes from... from something that is still making noise and it's still making noise and it's still making noise. It's going to explode one day. I mean, maybe not tomorrow, and also, it's not the... our friend, the leader in all this, he is everywhere every day

ORTEGA also acknowledged CONSPIRATOR 1's[4] role in assigning him a portion of the PDVSA funds and fretted aloud:

> It's all that shit they've been talking about, investigations and shit. Or the Americans going into all this, is that true? How far does that reach?
>
> But, how far could they get, in your opinion? If they get to the Swiss and they tell them, "I want, I want this information." Do they have to give it to them?

Finally, the CS and ORTEGA walked through some account opening forms and discussed how ORTEGA could avoid declaring himself as a politically exposed person (also known as a PEP) on bank KYC documents.

57.   In a February 23, 2016 recorded conversation with "CONSPIRATOR 3" (CONSPIRATOR 1's brother), the CS explained that the CS's trustee is liquidating and "eventually there's a risk of the trustee checking the operation" and finding that the "the guys did a fake deal, falsifying the signatures of these guys who are there." The CS explained that the CS called URDANETA and CONSPIRATOR 1 and told them that they have to set the documentation straight. The CS and CONSPIRATOR 3 also discussed a meeting in Caracas between the CS, URDANETA, and AMPARAN about fixing the document, and CONSPIRATOR 3 noted that he has a "payment for [VENEZUELAN OFFICIAL 1]."

---

[4] CONSPIRATOR 1 is a former PDVSA official.

58.     In a March 7, 2016 recorded meet with URDANETA, the CS and URDANETA recounted the receipt and expenditure of the PDVSA funds to date ("seventy eight million eight hundred and something"). They recounted how much belonged to CONSPIRATOR 1 ("fourteen million five hundred forty thousand six hundred twenty-five") and other expenditures, including a list of cash payments to include payments to VENEZUELAN OFFICIAL 1 who authorized the underlying PDVSA loan agreement. The CS recounted the cash kickbacks to VENEZUELAN OFFICIAL 1 as follows:

> [VENEZUELAN OFFICIAL 1], I gave him… to the boy he sent in one occasion two hundred thousand [200,000], June fourth [4th] and in another occasion one hundred thousand [100,000], on June twenty sixth [26th].

URDANETA agreed. URDANETA and the CS then discussed AMPARAN's plan to make new fake contracts justifying the transaction (the CS noted to URDANETA that AMPARAN is flying to Miami in several days). URDANETA was concerned that he didn't want to leave a trail of "breadcrumbs" with respect to the accounts. URDANETA again acknowledged CONVIT's involvement and CONSPIRATOR 1's arrangement with ORTEGA. CONSPIRATOR 1 joined the meeting and discussed with URDANETA and the CS the fake joint venture contract, who was responsible for it, and how to divide up the PDVSA funds.

59.     Importantly, at this meeting, URDANETA and CONSPIRATOR 1 reviewed a spreadsheet of all the cash payments and expenditures created by the CS; each acknowledged the contents of the document, wrote notes on it, checked off transactions, and, ultimately, dated it. The CS provided a copy of this document to HSI-Miami with both URDANETA and CONSPIRATOR 1's handwritten notes; included on the spreadsheet are the kickback payments to VENEZUELAN OFFICIAL 1.

60.     In a March 9, 2016 recorded meet with AMPARAN and URDANETA, AMPARAN ran through the plan to replace the fake joint venture agreement with new documents.

AMPARAN explained that the fake agreement could be replaced with the new (better) fake ones in the compliance file at the Canadian bank and added to the file at European Financial Institution 1, and further that the "Accounting Firm 1" auditors are on board. AMPARAN explained that he is flying to Miami the next day and from there he will print out and provide the CS with the new fake contracts.

61.    In a March 15, 2016 recorded meet with ORTEGA, ORTEGA explained to the CS that he has found a "person" (GUSTAVO) with a "structure" to transfer his PDVSA funds to ORTEGA, and asks the CS to meet with the person in New York, Miami, or Panama. ORTEGA asked the CS what the CS's story is and why the CS is acting differently "overnight" and whether it is "an investigation"; the CS explained that everyone is "making messes," that the CS has "start[ed] to find out about stuff ... the [CS] didn't know," and that the CS is stopping because the CS doesn't want to get into trouble. ORTEGA explained that the rumor is that the "Americans are investigating you, that you are in big trouble" and asked the CS whether the CS is under investigation and what the banks have asked the CS.

62.    In an April 2, 2016 recorded meet with ORTEGA and GUSTAVO in Panama, ORTEGA introduced the CS to GUSTAVO, who explained how he can launder money using his brokerage firm and private mutual fund. Specifically, GUSTAVO explained that his brokerage firm, GSA, operates from the United States, but primarily does business in Latin America and manages $2 billion.[5] Regarding GSA's reputation, GUSTAVO explained:

> I would say that our profile, would be by-by nature a business that we prioritized the type of client with which we deal, uh...let's say if it is a low profile, we go even

---

[5] I am further aware, that GSA is affiliated with Global Strategic Investments, LLC (GSI), which is a broker/dealer headquartered in Miami, Florida. GUSTAVO and the CS would later conduct numerous meetings at GSI's office in Miami.

lower, that way they will never talk about us, or any advertising, or any cocktail parties.

GUSTAVO explained that they operate a fake mutual fund which receives money from a payment made to look like an investment into the fund, but is actually laundered out of the fund. GUSTAVO explained that "we'll make the transactions in such a way that the purchase will look legitimate" and that the money can be directed anywhere on the back-end using "cards" or "checks" or even "wire transfers," but as to the latter he (GUSTAVO) will "always be on the lookout to see the transfer and who's receiving it, because...[l]ike the saying goes, the fish dies by its mouth. ...they have their eyes on everyone." GUSTAVO went on to explain how he can avoid being tracked by the authorities such as Interpol and acknowledged that ORTEGA and the CS's situation is a "time bomb." Finally, GUSTAVO insisted that they use WhatsApp to communicate and avoid emails.[6]

### Cooperation Begins & Conspiracy Continues in Miami

63.     In April 2016, the CS began cooperating with HSI-Miami and continued making consensual recordings with the defendants and other conspirators.

64.     The conspiracy continued in four primary aspects. First, AMPARAN worked to replace the fake joint venture contact with better fake contracts to justify the initial transfers to the CS. Second, AMPARAN worked to launder URDANETA's portion of the PDVSA funds from the CS using false investments. Third, GUSTAVO worked to launder ORTEGA's portion of the PDVSA funds from the CS, also using false investments. And fourth, KRULL and GUSTAVO worked to launder additional PDVSA funds that did not originally flow through the CS.

---

[6] Based on my training and experience, encrypted peer-to-peer chat services, such as WhatsApp, are preferred by individuals engaged in criminal activity because law enforcement is generally unable to obtain the content of the communications from the service provider.

65.     During the course of this conspiracy, GUSTAVO also laundered funds as part of a scheme to promote international narcotics trafficking. KRULL also contacted the CS with several separate plans to launder money from at least one foreign bribery scheme, all as set forth below.

<u>AMPARAN's Replacement of the Fake Joint Venture Contract</u>

66.     In a recorded April 27, 2016 meet with AMPARAN at the Miami, Florida office of Solar Cargo, Inc.,[7] AMPARAN and the CS discussed the fake joint venture contract and AMPARAN acknowledged that it was meant to justify the movement of the PDVSA funds to the CS and that CONVIT was involved. AMPARAN assured the CS not to worry about European Financial Institution 1 and the fake contract because European Financial Institution 1 will let him know if there is an investigation and AMPARAN "can manipulate that." AMPARAN and the CS discussed supplemental fake contracts AMPARAN had previously prepared and provided. AMPARAN also began to explain how he will launder URDANETA's portion of the PDVSA funds using fake bonds.

67.     On or around May 26, 2016, the CS received a BBM chat from AMPARAN instructing him where in Venezuela to pick up the proposed fake contracts. The CS had an assistant pick up the replacement fake contracts from AMPARAN and provided them to HSI-Miami.

68.     On May 25, 2016, URDANETA sent a BBM chat to the CS stating that "['CONSPIRATOR 4'[8]] ... has an offer and I prefer you to speak directly with him." On May 27, 2016, the CS had a recorded call with CONSPIRATOR 4, and explained to CONSPIRATOR 4 that the CS was working with AMPARAN to fix things and that the CS had explained to the bank

---

[7] AMPARAN explained in the recorded meet that he works for Solar Cargo, that it has six planes operating, and that he had recently been hired by PDVSA to move medicine from Iran to Venezuela.

[8] CONSPIRATOR 4 is associated with CONVIT and formerly with PDVSA .

that the PDVSA funds were from an exchange transaction. CONSPIRATOR 4 responded "Oh they made it up" and the following conversation ensued:

> CONSPIRATOR 4:   This is bad. This is bad when not-not-not... The truth is not spoken and can't-can't-can't even do [unintelligible] regarding it since it never happened.
>
> CS:   Uh-huh. But...the truth was a foreign exchange transaction, correct?
>
> CONSPIRATOR 4:   The truth it was, was, was not a foreign exchange transaction. It does not exist in Bolivars. Not at all, it was a payment [unintelligible]

CONSPIRATOR 4 suggested a meeting in Venezuela with everyone who has "an interest" to sort things out and fix "the papers" before things get bad when it is too late.

69. On June 13, 2016, the CS met with AMPARAN in Venezuela and they executed replacement fake contracts. The replacement fake contracts (later provided to HSI-Miami by the CS) included a complex array of bogus financing and trust documents involving Rantor, the CS's trust, and other entities.

70. On June 22, 2016, AMPARAN sent the CS an email with a fake loan agreement between Solar Cargo and Rantor meant to supplement the replacement fake contracts. In BBM chats between AMPARAN and the CS in August 2016, AMPARAN asked if the CS received the latest contract, and the CS responded yes. On September 5, 2016, AMPARAN sent the final fake contract between Solar Cargo and a company belonging to the CS. All of these replacement fake contracts were backdated to early 2014.

<u>AMPARAN and URDANETA's Efforts to Continue Laundering PDVSA Funds</u>

71. As mentioned above, in an April 27, 2016 recorded meet with AMPARAN in Miami, the efforts to launder URDANETA's portion of the PDVSA funds from the CS occurred simultaneously to AMPARAN's efforts to replace or supplement the fake joint venture contract.

During that meet, AMPARAN explained how he would launder URDANETA's portion of the PDVSA funds using the purchase of a fraudulent bond designed to default to conceal the transfer:

> we are now working through a mechanism, through which, we issue a bond through a bank, from which we have, eh, on which we have a lot of influence, or several banks, but one in particular that is the one, we are working with right now, we issue a bond. … That you on that side would buy, you would make an investment in that bond, we receive, um, that, eh, receive that money for the purchase of that bond and you keep the bond on that side. In the term of, a number of months, that bond starts going down in price, … until there comes a moment when it flips, … but the account is never closed, nor, nor are funds transferred, the funds never leave, and an investment is made.

72.    In a May 12, 2016 recorded call with URDANETA, URDANETA and the CS recounted the CS's meeting with AMPARAN and the defaulting-bond laundering plan. URDANETA brought up an apartment "over there" in Miami for which he paid a significant deposit that he is being pressured to close on in 60 days by the developer and agreed to send the CS the notice from the developer.

73.    URDANETA later sent the CS an image of a May 10, 2016 email from the developer of the Porsche Design Tower in Miami, informing him of the upcoming closing on the unit. The email included "Pre Closing Questionnaire" provided by the developer contains the following warning: "Note: taking title under a company or trust may trigger FinCEN reporting requirements." In a follow up chat with the CS, URDANETA explained that he was worried about the FinCEN reporting requirement and discussed ways to minimize the risk; URDANETA suggested forming a new company with his wife as the beneficial owner.

74.    In a May 17, 2016 recorded call with URDANETA, URDANETA discussed the transfer of the Miami condominium with the equity of URDANETA's down payment to AMPARAN as a fee for AMPARAN's laundering services. And, in a May 18, 2016 recorded meet

with AMPARAN at Solar Cargo in Miami, AMPARAN and the CS discussed using the Miami condominium as a fee[9] and moving forward with the defaulting-bond laundering plan.

75.     In a November 21, 2016 BBM chat, AMPARAN provided the details of an additional fraudulent bond purchase to launder URDANETA's PDVSA funds and explained that the bond purchase will be facilitated through a U.K. broker dealer, "European Financial Institution 2."

76.     In a March 1, 2017 recorded meet, the CS met with URDANETA, AMPARAN, "CONSPIRATOR 5,"[10] and GOIS, at the offices of European Company 1 in Madrid, Spain. Prior to the meeting, URDANETA was captured on the recording explaining to the CS that the CS should not be concerned about the fake joint venture contract or being caught because they only had to worry about the United States and the "Americans ... have no jurisdiction"; URDANETA uses the word "launder" to describe their activities.

77.     The purpose of the meeting was for the CS to gain comfort with the "operation" proposed by AMPARAN. CONSPIRATOR 5 and GOIS were introduced as the managers of the operation and meant to comfort the CS, who had relayed misgivings to URDANETA about working with AMPARAN.

78.     During the meeting, GOIS asked if there is anything he can tell the CS to make him more comfortable and the CS noted that he was concerned about European Financial Institution 2

---

[9] AMPARAN and URDANETA would later report that they worked out a solution to achieve the transfer. Miami-Dade Property records show that the property was transferred from the developer to Paladium Real Estate Group LLC on January 12, 2017. According to the Florida Department of State, Paladium was formed on May 26, 2016 with URDANETA's wife as an owner. On September 23, 2016, AMPARAN's wife was added as a manager of Paladium, and on September 15, 2017, after the closing, URDANETA's wife was removed, leaving AMPARAN in control of Paladium and the condominium.

[10] CONSPIRATOR 5 is a third-party money launderer.

because they asked "no question" and had "no objection" when an account was opened in the CS's name to purchase the fake bond. GOIS explained that there is no issue with European Financial Institution 2. AMPARAN, GOIS, and CONSPIRATOR 5 went on to explain that they manage a fund which allows them to "generate payment structures, and third party payments institution, with a very light KYC." AMPARAN emphasized that they can make payments to "Miami, Panama, Europe"; the CS clarified, "And you have no issues paying in the United States?", to which AMPARAN replied, "No." GOIS explained that the CS should first buy a U.K. GILT, then transfer it to an account in the CS's name at European Financial Institution 2, after which it will be swapped with the fake bond to begin the transfer to URDANETA.

79. On April 26, 2017, the CS, at the request of GOIS and URDANETA, purchased a 5-million-pound U.K. GILT. On June 20, 2017, the CS, at the request of GOIS, ordered his bank, to "free deliver" the GILT to an account opened for the CS at European Financial Institution 2. At European Financial Institution 2, GOIS would oversee an operation to have the GILT exchanged for a separate worthless bond, so the funds could ultimately be transferred to and concealed for URDANETA. Thereafter, the parties continued to discuss the movement of the balance of URDANETA's portion of the PDVSA funds through 2018, though no additional funds have been moved to date.

80. In a recorded December 11, 2017 meet with GOIS in the U.K., GOIS explained how European Company 1 is the front supporting the laundering operation with the fake bond, and that AMPARAN, CONSPIRATOR 5, and "CONSPIRATOR 6"[11] are the directors. GOIS also lamented their criminal exposure, and advised the CS as follows:

> ...the faster you get out, the better for you. Because if you... they're going to lock us all up. That... I'm telling you, [CS], what do you want me to tell you? That it's

---

[11] CONSPIRATOR 6 is a third-party money launderer.

not like that? It's the truth, there's going to be a day that they are going to lock all of us up; they are going to lock us up. This will be known. [CS], I have no doubt. I already saw where the shit comes from. I saw where it comes from, how they're doing things, then in the end, whoever has the money is the one who is going to have problems. The rest, well, he will have to defend himself, saying "Look, I got paid here." You'll defend yourself in your own way, I'll defend myself in the same way. But that will happen

### ORTEGA and GUSTAVO's Efforts to Continue Laundering PDVSA Funds

81.    Also beginning in April 2016, ORTEGA and GUSTAVO continued their efforts to launder ORTEGA's portion of the PDVSA funds through GUSTAVO's fake mutual fund, which culminated in the actual movement of funds about a year later.

82.    In February 2017, the CS laundered some of ORTEGA's portion of the PDVSA funds with GUSTAVO's fake mutual fund structure at ORTEGA's direction. On February 21, 2017, GUSTAVO emailed the CS subscription instructions and a subscription agreement for the fake fund. Per these documents, the name of the fund was Global Securities Trade Finance, a Cayman Islands entity, and the custodian bank was "US Financial Institution 1" in New Jersey. On February 24, 2017, the CS instructed a bank in the Bahamas (where a portion the PDVSA funds were then held) to subscribe to the fund per the instructions in the amount of 5,000,0000 U.S. Dollars. Thereafter, on or around February 28, 2017, that amount was wired to U.S. Financial Institution 1; the fake subscription was obtained by the CS, and the 5,000,000 U.S. Dollars was available for further use by ORTEGA.

83.    In a March 29, 2017 recorded meet in Miami, Florida, the CS asked GUSTAVO about U.S. Financial Institution 1 and GUSTAVO explained that the bank is controlled by his partners in Uruguay, who also control another bank in Puerto Rico ("U.S. Financial Institution 2") and that they "have our people in the back" of the bank.

84.     In numerous BBM chats between the CS and ORTEGA, ORTEGA asks how things are going with "G" (GUSTAVO) and acknowledges the ongoing laundering of his (ORTEGA's) funds.

85.     Later in April 2017, GUSTAVO, with ORTEGA's agreement, laundered $400,000 of the $5,000,000 back to the CS as the CS's "fee" for the CS's role in facilitating the laundering of ORTEGA's $5,000,000 to GUSTAVO. The CS provided GUSTAVO with an undercover (UC) bank account in the name of a shell company in the Southern District of Florida to receive the fee. On April 24, 2017, GUSTAVO wired $396,000 from U.S. Financial Institution 1 to the UC account. To "justify," i.e., conceal, the transaction, GUSTAVO created a fake loan contract between the UC shell company and Global Securities Trade Finance.

86.     The next stage of this scheme was the laundering of the fake subscription out of the CS's account and into an account ultimately benefiting ORTEGA in order to eliminate any final trace of the movement. GUSTAVO and ORTEGA proposed several methods for this, which the CS rejected. These efforts continue to this day. Over the course of the summer of 2017, however, GUSTAVO revealed his connections to yet another complicit U.S. financial institution, U.S. Financial Institution 2, in an effort to launder the subscription.

87.     In a recorded June 7, 2017 meet with GUSTAVO, GUSTAVO told the CS that he works with U.S. Financial Institution 2, that he knows the owner, and that he can facilitate things: "Sure, and discreet. And the good thing about [U.S. Financial Institution 2] is that without being, without being in U.S., it is in U.S....in Puerto Rico." GUSTAVO later introduced the CS to GUTIERREZ, the majority shareholder of U.S. Financial Institution 2, and the CS and GUTIERREZ agreed to meet in the future.

88.     On July 31, 2017, GUTIERREZ flew to Miami from Uruguay to meet with the CS. During a recorded meet on July 31, 2017 with GUTIERREZ in Miami, the CS explained to GUTIERREZ that the CS needed to transfer GUSTAVO's fund subscription to GUSTAVO's "client" (ORTEGA) with no trail. The CS and GUTIERREZ discussed options including internal account-to-account transfers at U.S. Financial Institution 2.

89.     In a recorded August 14, 2017 call with GUTIERREZ, GUTIERREZ and the CS further discussed the subscription to GUSTAVO's fund. GUTIERREZ offered possible schemes to justify the transaction   using U.S. Financial Institution 2 and agreed that U.S. Financial Institution 2  will charge a two-and-a-half percent (2.5%) fee.

90.     During a recorded August 15, 2017 meet with GUSTAVO in Miami, Florida, the CS complained to GUSTAVO about how explicit GUTIERREZ was regarding their criminal activities because he seemed reckless, and the following conversation ensued as GUSTAVO attempted to reassure the CS that GUTIERREZ did not know about the ORTEGA "kick-backs":

| | |
|---|---|
| CS | I mean, I didn't tell him, "Look, this Ortega thing is a *kick-back,"* but I imagine that he knows what it is, I mean… |
| GUSTAVO | No, no, I haven't told him anything at all, I mean, zero [0], zero [0], zero [0].  And I will never tell him anything because it's not necessary.   I never say anything to these people because *you don't need to.*  There isn't, I mean… everything is done well. |

91.     ORTEGA ultimately rejected the U.S. Financial Institution 2 option because he wanted to avoid the United States. The transfer of the subscription remains unresolved.

### GUSTAVO's Other Laundering Schemes

92.     During the course of multiple meetings in Miami with the CS, GUSTAVO attempted to develop a relationship with the CS as a potential feeder of additional criminal clients

in need of money laundering. Indeed, GUSTAVO would go on to encourage and develop additional money laundering schemes with the CS, touting his connections at multiple U.S. financial institutions along the way, including other broker/dealers, in addition to U.S. Financial Institutions 1 & 2.

93. In a November 8, 2016 recorded meet in Miami, the CS conducted a sting against GUSTAVO, informing GUSTAVO about a "client" who had to buy a plane in Brazil that is "doing a delicate job" and is "going to move ... sensitive merchandise." Prior to the CS proposing this transaction, GUSTAVO assured the CS that the CS could speak frankly as they were "beyond good and evil." The CS explained that the client needed to pay someone in Spain for the plane, but that the payment could not be traced back to the plane because "there could be a risk ... the authorities eventually investigate the plane." GUSTAVO responded "ok" and "uh huh" without hesitation. The CS further explained that source money is in the United States and is completely clean. GUSTAVO suggested some options and quickly agreed: "We'll open an account right away ... and we'll make the payment" and that they will justify receiving the payment by selling the "client" a "product," i.e., a false investment. The CS and GUSTAVO agree to only charge the "client" ten percent (30,000 U.S. Dollars) in the hopes that he will do more business with them.

94. Thereafter, GUSTAVO and the CS discussed the logistics of the transfer on several occasions. In January 9, 2017 recorded meet, the CS explained to GUSTAVO that the CS was worried about ORTEGA and the money they (Venezuelan kleptocrats) are moving more than the CS was "worried about the plane, the DEA." GUSTAVO responded, "Yes, yes."

95. On January 10, 2017, the CS and GUSTAVO commenced the transaction. Upon the CS receiving instructions from GUSTAVO, HSI-Miami wired 300,000 U.S. Dollars from a UC account in the Southern District of Florida to a U.S. Wells Fargo account held by Global

Securities Management LLC, and, on or around January 13, 2017, the funds were received in a UC account in Spain as instructed. As previously agreed, GUSTAVO emailed the CS a fake 300,000 U.S. Dollar loan contract to support the initial transaction as well as an invoice from Global Securities Management in the amount of 30,000 U.S. Dollars for "Loan Structuring."

### KRULL's Conspires to Launder Additional PDVSA Funds with GUSTAVO

96.     In October 2016, the CS met with KRULL in Panama. KRULL explained that he was looking for a bank to deposit approximately 600,000,000 U.S. Dollars from a currency exchange with PDVSA on behalf of a client, "CONSPIRATOR 7,"[12] and which the CS learned were located in Gazprombank. The CS stated the CS could explore some options but needed a contract proving the source of funds. On November 8, 2016, KRULL explained that he had the contract. In a November 17, 2016 WhatsApp chat, KRULL asked if the CS had "the hush" (meaning hushmail, an encrypted email provider), and the CS provided a hushmail address. That same day a PDVSA loan contract arrived at the CS's hushmail account.

97.     The PDVSA contract that the CS received from KRULL was an amendment to the original contract between PDVSA and Rantor, and doubled the credit line from 7.2 to 14 billion Bolivars. The amendment was dated May 25, 2015, and specifically incorporated the initial PDVSA loan contract.

98.     Over the course of the next few weeks, KRULL continued to press the issue over WhatsApp chats, explaining his client was in a "hurry." On November 30, 2016, the CS and KRULL met again in Panama. Per the CS, KRULL explained that the funds came from exchange contracts which generated around 1.2 billion U.S. Dollars. KRULL explained that, in addition to

---

[12] CONSPIRATOR 7 is another reported billionaire member of the "boliburgués" and owner of a television network in Venezuela.

25

the 600-million-Dollar solution for CONSPIRATOR 7, KRULL needed an additional solution for 200 million U.S. Dollars held in European Financial Institution 1 in the name of a straw owner, "CONSPIRATOR 8." (The CS recognized CONSPIRATOR 8 as a straw owner previously proposed to be used to conceal money for the stepsons of VENEZUELAN OFFICIAL 2, a.k.a, "los chamos," during a prior meeting with the CONSPIRATOR 8, CONVIT, and "los chamos.")

99.     On November 30, 2016, KRULL sent the CS a WhatsApp message with photos of CONSPIRATORS 7 and 8's Venezuelan passports. KRULL also forwarded an email to the CS explaining the European Financial Institution 1 structure; the email was in fact a string of previously forwarded emails attaching documents from European Financial Institution 1, which had been sent from AMPARAN to "CONSPIRATOR 9," to CONSPIRATOR 7, to KRULL, and to the CS.

100.     In early December 2016, the CS informed KRULL of a solution for laundering the additional PDVSA funds. The CS ultimately proposed GUSTAVO and his mutual-fund laundering solution. On December 21, 2016, KRULL sent the CS a resume for CONSPIRATOR 8, whom KRULL referred to as his "buddy." In a later recorded January 7, 2017 phone call with KRULL, the CS explained that he could not use the CONSPIRATOR 8 resume, noting "this shit is a joke." KRULL agreed, "Yes, it's a joke…. I agree, I agree."

101.     In a recorded January 9, 2017 meet with GUSTAVO in Miami, the CS asked GUSTAVO for a solution similar to ORTEGA's for CONSPIRATORS 7 & 8, and GUSTAVO immediately agreed. GUSTAVO noted that CONSPIRATOR 7 has one of the wealthiest fortunes from the "chavismo." GUSTAVO walked through all the different laundering options for both and how to handle any "KYC" issues. KRULL later agreed to the solution presented by GUSTAVO, and in BBM chats would acknowledge "Gustavo" when inquiring of the status. The CS and

KRULL and the CS and GUSTAVO had numerous recorded conversations and message chats about the scheme over the course of months.

102.    In a January 10, 2017 recorded conversation, KRULL noted that "[CONSPIRATOR 7]" is asking if the money can be sent. In another, on January 23, 2017, KRULL said the money at European Financial Institution 1 is ready to be moved to CONSPIRATOR 8 and that "I met the dude, and also met the guy that represents him." The CS asked, "Are these the guy's sons?" (meaning the stepsons of VENEZUELAN OFFICIAL 2), and KRULL responded, "Nah. Don't, don't, don't ask."

103.    In a January 31, 2017 recorded call, the CS informed KRULL that he is in Miami and both discuss the laundering further.  KRULL acknowledged receiving money from the European Financial Institution 1 accounts before (i.e., other laundering activity) when he described how the wires work.

104.    On March 7, 2017, KRULL sent the CS a WhatsApp chat and explained that the clients are asking about GUSTAVO's fund being in the United States. In a March 7, 2017 recorded call, KRULL advised that "[CONSPIRATOR 7]" is worried, and the CS explained that the fund is not in the United States, but that GUSTAVO has offices in the United States (Miami and New York). The CS explained that GUSTAVO lives in Miami. KRULL asked if GUSTAVO can fly to Panama, and the CS assured KRULL he could.

105.    On March 16, 2017, the CS met with KRULL and CONSPIRATOR 8 in Panama, and at one point called GUSTAVO (who was not in Panama) to discuss the laundering operation. During the meeting, CONSPIRATOR 8 stated that he "represented three persons." After the meeting, KRULL confided to the CS that he had once seen CONSPIRATOR 8 at CONSPIRATOR 7's office having lunch with "los chamos," i.e., the stepsons of VENEZUELAN OFFICIAL 2.

106.    In a recorded April 5, 2017 call with KRULL, KRULL stated that CONSPIRATOR 8 was worried about wiring funds to purchase GUSTAVO's fraudulent fund to U.S. Financial Institution 1 in New Jersey because he was worried about using U.S. banks. KRULL explained that he told CONSPIRATOR 8 it was irrelevant because all U.S. Dollar wire transactions travel through correspondent banks in the United States regardless.

107.    In a recorded April 14, 2017 meet in Miami with KRULL, KRULL and the CS discussed GUSTAVO and CONSPIRATOR 7 and the plan to launder the other PDVSA funds.

108.    GUSTAVO and KRULL would continue to discuss this scheme with the CS for months thereafter. For instance, in a recorded call with KRULL on August 2, 2017, the CS told KRULL, "I am going to be with GUSTAVO tomorrow … and he's going to ask me about the fund with the children." KRULL explained that he is not sure, but that "CONSPIRATOR 7" may be doing something on it with "Chente" (AMPARAN) and explained that he (KRULL) speaks mostly to "[CONSPIRATOR 8]" about it because he is "the client."

109.    Records obtained from email search warrants confirm the flow of the PDVSA funds from PDVSA to the defendants and other conspirators through European Financial Institution 1. For instance, a September 2015 email circulated among AMPARAN and CONSPIRATORS 5 and 6 with the subject line "Numeros [CONSPIRATOR 7]" includes an attachment titled "Operation 600k," which contains the following work sheets:

a.    A work sheet titled "Detailed Income from PDVSA" shows ten transfers from PDVSA from December 29, 2014 through February 3, 2015 totaling 511,913,270.74 Euros.

b.    A work sheet titled "Summary of the 600 Operation" shows that, of the 511 million Euros: 20,476,530.83 was assigned to European Financial

Institution 1 as a 4% fee; 227,265,537.52 Euros went to the "BOLI" (CONVIT and CONSPIRATOR 2);  159,085,876.26 Euros went to "CHAMOS" (the stepsons of VENEZUELAN OFFICIAL 2); and 68,179,661.26 Euros went to CONSPIRATOR 7. The remaining 36,905,664.87 Euros was accounted for as the "Cost" of the initial 7.2 billion Bolivars used to obtain the 511 million Euros.

      c.     Further worksheets account for how each recipient moved the money. The "BOLI" for instance moved 78.8 million Euros to the CS and the majority of the rest through apparent shell companies, Volbor Vontobel and Vencon Holding. CONSPIRATOR 7 sent dozens of U.S. Dollar wires through banks in Malta and Austria, including to aviation and yacht services as well as brokerage companies in Miami, Florida.

These records not only exhibit the conspiracy in blunt detail, but confirm the connection among KRULL and the additional conspirators and the initial 78.8 million Euros in PDVSA funds received by the CS.

<u>KRULL's Additional Venezuelan Laundering Schemes</u>

      110.    Throughout the course of KRULL's scheme to launder the additional PDVSA funds with the CS, KRULL presented other laundering schemes to the CS. One of the schemes involved a relative of VENEZUELAN OFFICIAL 3 who needed a way to receive kickbacks from foreign law firms who had been hired by the Government of Venezuela.

      111.    KRULL first approached the CS with this scheme in the summer of 2017 because KRULL needed a laundering structure for receiving the kickbacks.  Both KRULL and the CS agreed that GUSTAVO was again a good laundering option.

112.    On June 29, 2017, KRULL called the CS and, in a recorded conversation, the CS told KRULL that he is in Los Angeles, California. KRULL said he has to be "candid and direct" and stated:

> Uh, I'm sitting here with, with, with, with the [title of VENEZUELAN OFFICIAL 3]'s brother.... And, and, and well, they, they, they have earned in the last years a payment they're going to receive that is for five [5]....Okay? And, and, and we have been talking about the, the, the options they, they might have. Right? And, and, and I don't know if, if, if you have something that you, that you might think of, as to how it can be, uh, things can be structured. Right?

113.    The CS noted that it may be difficult based on the recipient's profile, but said they can talk more tomorrow and explained he will be flying to Miami then. In a later recorded call on June 29, 2017, KRULL further specified that these were payments from law firms that had handled international arbitrations on the Venezuelan government's behalf with international companies and had charged the government a lot of money (5,000,000 U.S. Dollars). In a recorded call the next day, June 30, 2018, the CS, KRULL, and VENEZUELAN OFFICIAL 3's brother discussed ways to launder the payment which was again explicitly described as payments deriving from law firms who represented Venezuelan government in arbitrations. Different options for laundering the payments and "KYC" requirements were discussed.

114.    In a recorded August 25, 2017 meet with GUSTAVO in Miami, the CS explained that KRULL had two clients related to VENEZUELAN OFFICIAL 3 who needed a way to launder the payments they are going to receive from attorneys who were hired by the Venezuelan government. The CS specifically stated "the lawyers are giving them their kick backs" and GUSTAVO responded, "Mm-hmmm." The CS then suggested that the lawyers themselves would pay the kickback, and GUSTAVO immediately corrected him:

> No, they can't pay these two [2] guys.  No, that's impossible.... Just imagine. Specially nowadays with OFAC, and with all of these people reviewing every money transfer every day. .... Brother, that's kindergarten Algebra. Right? Well,

we will have to give a vehicle to each one of these guys...A private fund...The same thing we did for [ORTEGA].

115.    In recorded meetings on August 29, 2017 and November 14, 2017 with KRULL in Miami, the CS and KRULL further discussed the kick-back laundering scheme.

## CONCLUSION

116.    Based on the foregoing, probable cause exists that the defendants conspired to launder monetary instruments, in violation of Title 18, United States Code, Section 1956(h), and did travel in and use facilities of interstate and foreign commerce to further the laundering activities, in violation of Title 18, United States Code, Section 1952.

Respectfully submitted,

GEORGE F. FERNANDEZ, SPECIAL AGENT,
HOMELAND SECURITY INVESTIGATIONS

Sworn and subscribed before me
this 23 day of July, 2018.

EDWIN G. TORRES
UNITED STATES MAGISTRATE JUDGE